[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-15409
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 26, 2009
THOMAS K. KAHN
CLERK

NTSB No. -EA-5400
FAA No. SE-18092

JEFFREY R. SWATERS,

Petitioner,

versus

LYNNE A. OSMUS, Acting Administrator,
Federal Aviation Administration,

Respondent.

_____

Petition for Review of an Order of the
National Transportation Safety Board
_____

(May 26, 2009)

Before MARCUS and PRYOR, Circuit Judges, and SCHLESINGER,* District
Judge.

_____

* Honorable Harvey E. Schlesinger, United States District Judge for the Middle District
of Florida, sitting by designation.

MARCUS, Circuit Judge:

Appellant Jeffrey Swaters, a pilot formerly employed by Spirit Airlines, had his pilot and medical certificates revoked by the Federal Aviation Administration ("FAA") after failing a random drug test. The FAA's decision was upheld by an administrative law judge ("ALJ"), whose ruling was in turn affirmed by the National Transportation Safety Board ("NTSB" or "the Board"). Swaters petitions for review of the NTSB's decision in this Court. After thorough review, we affirm the NTSB's decision and deny Swaters's petition.

## I. FACTUAL BACKGROUND

The essential facts in the case are these. Swaters had been employed as a pilot by Spirit Airlines since 1999. On the evening of February 25, 2007, he arrived in San Juan, Puerto Rico during the course of a four-day trip. He spent the evening alone and met the rest of his crew -- his first officer and three flight attendants -- the following morning, February 26, 2007, at 4:55 a.m. On that day, Swaters and his first officer made flights from San Juan to Orlando, Florida; from Orlando to Fort Lauderdale, Florida; from Fort Lauderdale to Kingston, Jamaica; and from Kingston back to Fort Lauderdale. The last flight landed in Fort Lauderdale at 2:52 p.m.

Swaters was met at the gate by Susan Wagner, Spirit Airlines' Manager for Pilot Base Operations in Fort Lauderdale, who told Swaters that he had been

2

randomly selected to take a drug test that afternoon. Swaters apparently spent some time chatting amiably with Wagner and with Paul Olechowski, Spirit Airlines' Chief Pilot. It was 3:40 p.m. before Swaters was given the necessary paperwork to take to the testing facility. He was told to report to a collection site called Global MRO.

At around 4:20 p.m., Swaters phoned Olechowski to inform him that he had encountered car trouble and had been unable to reach the testing facility. Swaters then spoke with Toni Benson, Spirit Airlines' Drug and Alcohol Program Manager. Swaters told Benson that he was at a gas station and that his car had broken down. Because Global MRO closed at 4:30 p.m., Benson instructed Swaters to go to another facility, Concentra, which was open until midnight. She asked Swaters to get to the facility as soon as possible, and suggested that he take a cab. Swaters expressed unease at the idea of leaving his car in an unfamiliar part of town, and instead decided to replace and recharge his car battery.

Swaters subsequently arrived at Concentra between 6:30 p.m. and 7:10 p.m.[1] His sample was collected at 8:47 p.m. While at the facility, he signed and dated the following statement on the Federal Custody and Control Form ("CCF" or

---

[1] The record appears unclear as to precisely when Swaters arrived at the facility. Swaters signed in at 7:10 p.m.; however, he claims that he arrived at 6:30 p.m., and did not sign in until 7:10 p.m. because he was first required to complete paperwork. R. at 278. All citations are to the official agency record. Hence, the citation "R. at X" designates page X of the official agency record.

"custody form") used to keep track of his specimen: "I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct." He also initialed the sealed specimen bottles.

The sample was then sent to Quest Diagnostics, Inc., a laboratory approved by the Department of Health and Human Services ("DHHS") to perform federally-mandated drug tests. On March 8, 2007, Quest reported to Spirit Airlines that Swaters's sample contained metabolites associated with three prohibited controlled substances: benzoylecgonine (a metabolite of cocaine); morphine; and 6-monoacetylmorphine ("6-AM" or "6-MAM"), a metabolite associated specifically with heroin. The concentration of each substance was detected at levels far above the "cut-off points" allowed under federal regulations.[2]

Dr. Dale Plapp, one of Spirit's Medical Review Officers ("MROs"), verified the results and reported them to Swaters. Swaters denied taking the drugs, and indeed denied having taken drugs at any time during his career as a pilot. However, he offered no explanation as to how the drugs could have shown up in

_____

[2] Specifically, the cut-off point for benzoylecgonine is 150 nanograms per milliliter (ng/ml); the sample contained 9,455.91 ng/ml. The cut-off for morphine is 2,000 ng/ml; the sample contained 16,023.4 ng/ml. The cut-off for 6-monoacetylmorphine is 10 ng/ml; the sample contained 499.27 ng/ml. See Adm'r v. Swaters, NTSB Order No. EA-5400, 2008 WL 3272390, at *9 (Aug. 1 2008).

his sample. Swaters requested that a so-called "split sample" of his urine specimen be submitted for testing at another facility. Accordingly, the specimen was sent by Quest to Diagnostic Sciences, Inc. ("DSI"), another DHHS-approved testing facility. DSI reported the same results as those reported by Quest. The results were again confirmed by a Medical Review Officer.

Based on the finding of prohibited drugs in his system, Swaters was found to be in violation of Federal Aviation Regulations § 91.17(a)(3) and § 121.455(b).[3]

---

[3] Regulation 91.17(a)(3) provides that "[n]o person may act or attempt to act as a crewmember of a civil aircraft . . . [w]hile using any drug that affects the person's faculties in any way contrary to safety." 14 C.F.R. § 91.17(a)(3).

Regulation 121.455(b) provides: "[n]o certificate holder or operator may knowingly use any person to perform, nor may any person perform for a certificate holder or operator, either directly or by contract, any function listed in Appendix I to this part while that person has a prohibited drug, as defined in that appendix, in his or her system." 14 C.F.R. § 121.455(b).

The ALJ ultimately decided not to impose any sanctions for the § 91.17(a)(3) violation. The judge observed that "heroin, morphine and 6-monoacetylmorphine and cocaine were in [Swaters's] urine" while he was flying the plane and that, as a result, "there [wa]s no certainty that these drugs that he ingested did not affect his faculties in the prohibited fashion during the day of February 26, 2007." Order at *12. However, the judge stated that there "was no clear evidence from any observer that the Respondent showed any symptoms of drug use while flying." Id. As a result, he limited the imposition of sanctions to the §121.455(b) offense to avoid "any possible prejudice" to Swaters. Id.

It should also be noted that different prohibited substances are subject to different reporting and verification requirements. As the Board's decision notes, "DOT drug testing requirements specify that the MRO must verify a confirmed positive cocaine test result unless the employee presents a legitimate medical explanation for the presence of drugs found in his system. However, the MRO must verify the test result as positive, with no conditions, if the laboratory detects the presence of 6-AM (which indicates heroin use)." Order at *5 (citing 49 C.F.R. §§ 40.137(a), 40.139(a)).

5

On August 27, 2007, the FAA issued an emergency order revoking Swaters's

Airline Transport Pilot and First Class Airman Medical certifications.[4]

## II.  PROCEDURAL HISTORY

### A.  Proceedings Before the ALJ

Swaters appealed the FAA's emergency order to the NTSB.  Pursuant to the

NTSB's rules of practice, the FAA filed the order of revocation as the complaint in

the case, and a hearing was held before an NTSB administrative law judge on

March 3 and 4, 2008.  Since the evidence presented at the hearing is central to our

resolution of this dispute, we pause here to recount important portions of various

witnesses' testimony.

One key witness was Arthur Stachurski, the medical technologist at

Concentra who collected Swaters's urine sample on February 26, 2007.  Stachurski

said that he had no specific recollection of having taken Swaters's urine specimen.

However, he explained that he follows a standard set of procedures in collecting

each sample.  He described the procedures in this way:

---

[4] The FAA issues various kinds of pilot certificates -- e.g., an airline transport pilot certificate (for passenger airline pilots), a commercial pilot certificate (for pilots of non-passenger commercial aircraft), and a private, recreational or student pilot certificate. See, e.g., 14 C.F.R. §§ 61.1 - 61.167.  Each type of pilot certificate requires a corresponding type of medical certificate.  See 14 C.F.R. §§ 67.101 - 67.415.  In addition to revoking his Airline Transport Pilot certificate, the ALJ affirmed the revocation of Swaters's medical certificates.  As the FAA points out, Swaters does not challenge the revocation of his medical certificates in this appeal.  Red Br. at 3 n.4.

6

> What I do is, I fill up two vials, one 30 milliliters and one 15 milliliters, and then I put the labels that are on the CCF [on the vials], seal the bottles in front of the patient, and I have him initial them off, first and last initial. He does so. And then I put the specimen bottles in the bag in front of the employee, and I ask him to sign the CCF form stating that he has given me the urine, signed off on it, initialed them in his presence, and then I seal the bag in his presence as well.

R. at 306. The custody form is placed in the bag with the specimen bottles, and the bag is sent to a laboratory, such as Quest or DSI, for analysis.

Swaters also testified at the hearing. He claimed that he had not been allowed to witness certain of the steps described by Stachurski in the handling of his sample. In particular, he claimed that after his urine sample was poured into the two specimen bottles, Stachurski told him to dispose of the excess urine. According to Swaters, this allowed Stachurski to seal the bottles when Swaters was not present. Swaters also testified that he left the collection site after Stachurski told him he was "good to go," and that, as a result, Swaters never saw Stachurski place the specimen bottles in the plastic bag and seal it.

Finally, two expert witnesses testified at the hearing: the FAA called Dr. Robert White, DSI's Director of Clinical Chemistry, and Swaters presented Dr. Vina Spiehler, a pharmacologist certified in forensic toxicology. Each expert testified about the properties of the drugs in question; the extent to which the effects of the drugs might be observable in the behavior of a person under their

7

influence; and about how long after ingestion the metabolites associated with the various drugs could be detected in urine.

Dr. White was asked whether it would be unusual for no physical symptoms to appear in a person who had taken these drugs within ten to twelve hours of having ingested them. He responded:

> It depends on who's doing the observing, whether you've got a trained observer or not, first of all. Second of all, it depends on how much they took and it's the same thing after time and time again, you can go as low as a few molecules up to an overdose where somebody can't even move. It depends on how much they took.

R. at 355.

As for how long the metabolites associated with the various drugs remain present in urine, Dr. White testified that 6-AM metabolites stay in the system between two and ten hours. "It ought to be around for a couple of hours, may be out, depending on an individual's metabolism and their state of hydration, may be out to eight, ten hours." R. at 353. He was asked whether, given the level of 6-AM found in the sample at issue here, Swaters ingested the heroin within eight to ten hours of the test. Dr. White responded "I think so. And yes, this is a pretty substantial level in this case, so I would say well within that area." R. at 354.

Dr. Spiehler's testimony was largely consistent with Dr. White's. When asked about the observable symptoms associated with the different drugs, Dr. Spiehler said she "couldn't really extrapolate behavior or symptoms from urine

8

levels." R. at 451. She said that cocaine was a stimulant and that heroin had a sedating effect. R. at 453. While she described the behavior of people under the influence of each drug individually, she stated that she had never personally observed a person on both drugs simultaneously. She explained that, taken together, the effects of the drugs

> might be somewhat different. I've not actually seen a person go through conversion [from the effects of one drug to the other], but I've reviewed police reports of people who took both of them together. And initially, they show the cocaine stimulation and then after a few minutes, maybe 15 or 20 minutes . . . they switch over and go on the nod and begin to show the effects of the heroin.

R. at 453-54.

Dr. Spiehler also explained that the effects of the drugs "depend[] on the person's experience with the drug. If they've been using it chronically and have built up a tolerance, they'll show less effect and the effect will go away sooner . . . . So it depends not only on how much they take, but what their own personal tolerance is to the drug." R. at 455. Finally, she said that whether an observer would notice anything would "[d]epend[] on the level of closeness and observation of that person." R. at 462.

Dr. Spiehler was also asked how long the various drugs in question remain present in urine. She testified that based on the level of 6-AM metabolites in Swaters's sample, "I think it would have to have been more than two hours before

9

the urine was donated, but less than 12 hours." R. at 451. She explained: "The longest window of detection in urine I've seen in the literature is 12 hours, but it does take some time for it to get into the urine, especially to get into the urine in peak levels, and I think that's about two hours from my review of the literature." R. at 451-52. Furthermore, she opined that if the heroin had been ingested more than 12 hours prior to the urine collection, "[i]t's unlikely that [6-AM] would have been detected at all in the urine at a 10 nanograms per mil [l]evel." R. at 456-57. When asked whether 6-AM would have shown up in the urine if it had been taken fewer than two hours before, she said: "It's unlikely that it would be that high. It might be greater than 10 [ng/ml], but I don't think it would be as high as the 499 [ng/ml], or the higher numbers that were found by the second laboratory if it had been that soon." R. at 457.

At the conclusion of the proceedings on March 4, 2008, the ALJ announced his ruling orally upholding the FAA's revocation of Swaters's certificates. In addressing the procedures used in collecting Swaters's specimen, the ALJ said that he found Stachurski to be credible and found Swaters's testimony not to be credible. Specifically, the law judge said:

> I . . . find that Arthur Stachurski, the urine collector, is a completely credible witness with no reason to testify falsely. He did not remember the Respondent specifically, but testified to his usual procedures in collecting urine for DOT [Department of Transportation] random drug tests. He testified credibly that he always

10

> pours the urine from the collection cup into the two specimen bottles in the presence of the donor, has the donor sign the tamper evident seals, and places them on the specimen bottles in the donor's presence.
>
> . . . .
>
> I do not find the Respondent to be a credible witness in this regard. I observed his testimony and, while he was polite, I do not consider his demeanor to be convincing or forthcoming.

Adm'r v. Swaters, NTSB Order No. EA-5400, 2008 WL 3272390, at *8 (Aug. 1, 2008) ("Order").[5]

The ALJ also addressed Swaters's claim that he could not have taken the prohibited drugs after the start of his shift at 4:55 a.m. on February 26, 2007. The judge reasoned that, since no one who worked with Swaters during the time period in question saw anything unusual about his behavior, and since Swaters had hardly ever been alone while on duty, Swaters had probably not taken the drugs during working hours. The ALJ, however, made no finding of fact as to when Swaters had taken the drugs. The judge opined only that Swaters could have taken the drugs during the previous evening, when Swaters admitted to having been alone. As the ALJ stated:

> I agree that it appears indeed unlikely that [Mr. Swaters] could have ingested prohibited drugs in the quantities found in urine after he reported for work at 4:55 a.m. on February 26, 2007. However, that

---

[5] Our citations to the initial decision are to the copy attached to the NTSB's Opinion and Order.

does not preclude that he could have ingested the drugs during the evening of February 25th, 2007 when he was, by his own account, alone.

Id. at *10.

Although the experts had testified that 6-AM would not likely be present in a person's urine after twelve hours, the ALJ explained: "[t]he amount of time that 6-monoacetylmorphine is detectable in urine is an estimate, and from the testimony of Dr. White and Dr. Spiehler, could be influenced by the tolerance of the drug in the user, and by the quantity ingested." Id. Accordingly, on March 4, 2008, the administrative law judge upheld the FAA's revocation of Swaters's certificates.

## B.    Proceedings Before the Full Board

Swaters next appealed the ALJ's decision to the full National Transportation Safety Board, advancing essentially the same arguments as those he presented before the ALJ. On August 4, 2008, the NTSB entered a final order stating that it "agree[d] with the law judge's analysis and discern[ed] no basis to overturn his decision." Order at *3.[6]

First, the Board agreed with the ALJ's determination that the FAA had made a prima facie showing that Swaters's urine had tested positive for prohibited drugs.

---

[6] The Board's review of ALJ decisions is plenary. Singer v. Garvey, 208 F.3d 555, 558 (6th Cir. 2000) ("The NTSB has plenary review authority with respect to ALJ decision making."); see also 5 U.S.C. § 557(b) ("On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision[.]").

12

Indeed, the Board found "more than enough evidence to establish the Administrator's prima facie case." Id. at *5. Like the ALJ, the Board concluded that Swaters had "demonstrate[d] no legitimate issue with the chain of custody of his urine specimen, or any other grounds for concluding that the Quest Diagnostics and DSI Laboratory findings were not based on tests of the urine specimen respondent provided after his duty day on February 26, 2007." Id. at *3. The Board emphasized that the "law judge made a clear, adverse credibility finding against respondent's claim as to any errors in the collection procedure or chain of custody of the specimen sample." Id. at *4. The Board further explained that "credibility determinations are generally within the exclusive province of the law judge," and that it saw no reason to overturn the ALJ's assessment. Id.

The Board also rejected Swaters's objection to the ALJ's finding that Swaters could have ingested the drugs on the evening before the drug test. Citing portions of Dr. White's and Dr. Spiehler's testimony, the Board found that there was "a basis in the record for the law judge's conclusions regarding metabolism." Id. This was so, the Board concluded, even if Swaters's "point that there is no link between tolerance and metabolism may [have been] well taken." Id.

In light of these determinations, the Board was unpersuaded by Swaters's affirmative defense. Specifically, the Board explained that "[r]espondent's uncredited testimony and the testimony of his witnesses as to their observations

13

regarding the absence of any visible signs of drug intoxication, along with respondent's arguments regarding that evidence, are insufficient to carry his burden to rebut the [FAA's] prima facie case." Id. at *5 (emphasis omitted). Accordingly, the Board affirmed the FAA's revocation order and denied Swaters's appeal.

Swaters filed the instant petition for review in this Court.

## III. DISCUSSION

### A. Standard of Review

We have jurisdiction to review final orders issued by the National Transportation Safety Board. 49 U.S.C. § 1153(a) ("The appropriate court of appeals of the United States or the United States Court of Appeals for the District of Columbia Circuit may review a final order of the National Transportation Safety Board under this chapter."); see also 49 U.S.C. § 1153(b)(3) (giving the Courts of Appeals "exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and [to] order the Board to conduct further proceedings"). Our review of Board decisions, however, is narrow and deferential: we may disturb a decision by the NTSB only if it is arbitrary and capricious. Coghlan v. Nat'l Transp. Safety Bd., 470 F.3d 1300, 1304 (11th Cir. 2006) ("We uphold a decision by the NTSB unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or the challenged decision is contrary to constitutional right,

14

power, privilege, or immunity.") (quotation marks omitted). "In other words, when reviewing an agency decision under the 'arbitrary and capricious' standard, we must defer to the wisdom of the agency provided their decision is reasoned and rational." McHenry v. Bond, 668 F.2d 1185, 1190 (11th Cir. 1982).

"Findings of fact by the Board, if supported by substantial evidence, are conclusive." 49 U.S.C. 1153(b)(3); see also Coghlan, 470 F.3d at 1304. "Substantial evidence," we have explained, "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." McHenry, 668 F.2d at 1190 (citation and quotation marks omitted). "It is something more than a scintilla of evidence, but something less than the weight of the evidence; the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Id. (citation and quotation marks omitted).

Swaters advances two interrelated contentions on appeal: first, he argues that the NTSB erred in concluding that the FAA made a prima facie showing that his urine sample tested positive for prohibited substances; and second, he claims that the NTSB erred in concluding that he failed to establish his affirmative defense -- namely, that the urine specimen could not have belonged to him. We do not believe that it was arbitrary and capricious for the Board to have reached either of these conclusions.

15

**B.    The FAA's Prima Facie Case**

Swaters first suggests that the Board erred in concluding that the FAA succeeded in making a prima facie showing that his urine sample tested positive for prohibited drugs.  There is no dispute that the sample in question contained prohibited drugs.  Rather, Swaters's claim is that the sample was not his.  In particular, he contends that the collection and handling of his sample was somehow flawed.  On this record, however, we can find nothing arbitrary and capricious in the Board's determination that the FAA had established a prima facie case.

First, Arthur Stachurski's testimony clearly supports the Board's determination that proper safeguards and procedures were followed during the collection of Swaters's sample.  As we've noted, Stachurski recounted the steps he regularly takes in order to ensure the integrity of the samples he collects, and the record convincingly shows that these steps were observed in collecting Swaters's sample.  Moreover, Swaters himself initialed the sealed bottles and signed a certification expressly stating that the samples were sealed in his presence.  Swaters testified unequivocally that he understood that in initialing the seals, he was "certif[ying] that it's my urine and that it has been sealed."  R. at 439.  Dr. Brunelli, Quest Diagnostic's Laboratory Director, also testified that when Quest received the specimen bottles from Concentra, they showed no sign of any

16

tampering. We are hard-pressed to see how Swaters's sample could have become corrupted while in Concentra's or Stachurski's custody.

Likewise, there is substantial evidence to show that the integrity of Swaters's sample was maintained after it was sent to Quest for analysis.[7] Dr. Brunelli gave a detailed explanation of the procedures Quest uses to track samples after they are received: the sealed bag is opened and the bottles containing the samples are checked for signs of tampering; the specimen identification numbers on the seals are checked against the identification numbers on the custody form included with the samples; the sample is then assigned an internal tracking number, which is affixed to the custody form and to the specimen bottles; that number is then used to track the handling of the sample throughout the rest of the testing process. At the hearing, Dr. Brunelli reviewed the documents used to track Swaters's sample and verified that each of these steps was followed. R. at 337-39. He also testified that he observed nothing inappropriate or out of the ordinary in the testing of the sample, and that he had no doubt as to the accuracy of the testing of the sample. R. at 336.

In addition to evidence demonstrating the soundness of the chain of custody, the ALJ's determination regarding Swaters's lack of credibility represents a second, independent source of support for the Board's conclusion. Importantly,

---

[7] Swaters makes no challenge to DSI's handling of the split sample.

the ALJ did not simply believe Stachurski's testimony over Swaters's; rather, the judge made an explicit finding that Swaters was <u>not</u> a credible witness. That determination itself can be regarded as substantive evidence in favor of the ALJ's ultimate conclusion. <u>Cf.</u> <u>United States v. Woodard</u>, 459 F.3d 1078, 1087 (11th Cir. 2006) ("[A] defendant's testimony - if disbelieved by the jury - may be considered substantive evidence of guilt."); <u>United States v. Brown</u>, 53 F.3d 312, 314 (11th Cir. 1995) (same).

In short, on this record, we cannot say that it was arbitrary and capricious for the Board to conclude that the FAA made a prima facie showing that Swaters's urine sample had tested positive for prohibited substances.

## C.     Swaters's Affirmative Defense

Once the FAA has made out a prima facie case, the burden shifts to the respondent to advance an affirmative defense. <u>See, e.g.</u>, <u>Adm'r v. Gibbs</u>, NTSB Order No. EA-5291, 2007 WL 1726666, at *2 (June 5, 2007); <u>see also</u> <u>Miranda v. Nat'l Transp. Safety Bd.</u>, 866 F.2d 805, 809 (5th Cir. 1989) ("Once the FAA has established a prima facie case the burden shifts to [the pilot] to prove the validity of any affirmative defense he may have.") (quotation marks removed). The defense must be established by a preponderance of the evidence. <u>Adm'r v. Tsegaye</u>, NTSB Order No. EA-4205, 1994 WL 324279, at n.7 (June 23, 1994) ("We agree with the Administrator that respondent must do more than present a

18

prima facie case for an affirmative defense. Respondent must prove his affirmative defense by a preponderance of the evidence.").

Swaters first purports to identify irregularities in the collection and subsequent handling of his sample. Specifically, he notes that when Stachurski was interviewed, he could not recall any specific details concerning the collection of Swaters's sample. As a result, Swaters complains, "[t]he only evidence which caused the revocation of his certificates was the chain of custody, which is not . . . based on actual knowledge, but 'usual and customary' practice." Gray Br. at 9. But there is nothing remarkable about Stachurski's inability to recall the particulars associated with each individual donor weeks or months after the fact. Indeed, if anything, the fact that Stachurski had no special recollection regarding the taking of Swaters's sample suggests that the sample was collected without incident. In any event, Swaters must do more than point to Stachurski's inability to recall specifically that nothing untoward occurred in the collection of his sample. Rather, it is incumbent upon Swaters to affirmatively cite evidence suggesting that something went awry. This he has failed to do.

To be sure, Swaters claims that he was unable to witness the sealing of the bottles containing his sample and the sealing of the plastic bag in which the bottles were ultimately sent to Quest. Once again, however, the ALJ specifically found

19

that Swaters's testimony lacked credibility on this point, Order at *8, and the

NTSB found no reason to question the ALJ's finding. As the Board explained:

> In this regard, the law judge made a clear, adverse credibility finding against respondent's claim as to any errors in the collection procedure or chain of custody of the specimen sample and credited the testimony of the Administrator's witnesses. Board precedent is clear that credibility determinations are generally within the exclusive province of the law judge and will not be disturbed in the absence of arbitrariness, capriciousness, or some other compelling reason. Respondent demonstrates no compelling reason, nor do we discern one, to overturn the law judge's negative assessment of respondent's testimony.

Order at *4.

Substantial evidence supports the ALJ's adverse assessment of Swaters's

credibility (and the Board's acceptance of that assessment). Among other things,

the ALJ's determination is supported by the fact that, although Swaters claims not

to have witnessed the sealing of the specimen bottles, he initialed the sealed bottles

and signed the certification on the chain of custody form specifically stating that he

had witnessed the sealing. Because it is supported by substantial evidence, the

ALJ's determination regarding Swaters's lack of credibility is conclusive. We also

reiterate that the ALJ's credibility determination does not simply fail to support

Swaters's case; it constitutes positive evidence against Swaters and in support of

the FAA's case. Cf. Woodard, 459 F.3d at 1087; Brown, 53 F.3d at 314.

20

Furthermore, even assuming that the bag was not sealed in Swaters's presence, the Board still could reasonably have concluded that the sample belonged to Swaters. As we have noted, under the protocol followed by Stachurksi, by the time that samples are enclosed and sealed in the plastic bag, the bottles containing the samples have themselves already been signed and sealed. Hence, so long as the seal on the bottles showed no signs of tampering -- and Dr. Brunelli testified unequivocally that they did not -- the integrity of the sample could not have been compromised. FAA Guidelines address precisely this issue and make clear that failure to seal the bag in the donor's presence does not constitute a "fatal error." Specifically, 49 C.F.R. §40.199 provides:

> (a) As the MRO, when the laboratory discovers a "fatal flaw" during its processing of incoming specimens, the laboratory will report to you that the specimen has been "Rejected for Testing" (with the reason stated). You must always cancel such a test.
>
> (b) The following are "fatal flaws":
> (1) There is no printed collector's name and no collector's signature;
> (2) The specimen ID numbers on the specimen bottle and the CCF do not match;
> (3) The specimen bottle seal is broken or shows evidence of tampering (and a split specimen cannot be redesignated; and
> (4) Because of leakage or other causes, there is an insufficient amount of urine in the primary specimen bottle for analysis and the specimens cannot be redesignated.

49 C.F.R. § 40.199 (citations omitted).

The only actual error to which Swaters points is the notation on a form generated by Quest in processing Swaters's sample that indicated that the specimen had been collected at 8:47 a.m. instead of 8:47 p.m.  Yet Swaters fails to offer any suggestion as to how this might have affected the results of his urine test.  Pointing to this single error -- and a very minor one at that -- simply affords no ground for casting doubt on the entire sample-collecting process.

In short, the Board concluded that Swaters had "demonstrate[d] no legitimate issue with the chain of custody of his urine specimen, or any other grounds for concluding that the Quest Diagnostics and DSI Laboratory findings were not based on tests of the urine specimen [Swaters] provided after his duty day on February 26, 2007."  Order  at *3.  That determination was not arbitrary and capricious or in any other way contrary to law.

In addition, Swaters argues that the Board's determination was arbitrary and capricious because expert testimony presented at the hearing establishes that it is impossible for the sample to have been his.  Swaters first claims that, based on the pharmacological evidence in the record, he could not have ingested heroin prior to 4:55 a.m. on February 26.  Given 6-AM's short half-life, Swaters argues that the substance could not possibly have remained in his urine until his sample was taken at 8:47 p.m.  Nothing in the record, however, warrants so sweeping a conclusion.  Neither Dr. White nor Dr. Spiehler was ever asked whether the level of 6-AM

found in the urine sample would have been impossible if Swaters had ingested the heroin before 4:55 a.m.; nor did either expert volunteer any specific statement to that effect.

To be sure, the testimony of both experts suggests that the 6-AM level found in the urine sample would have been unlikely if the heroin had been taken on the day before the test (or at any rate, prior to 4:55 a.m on February 26). Dr. White surmised that, based on the 6-AM levels found in the sample, the substance would most likely have been taken within ten hours of taking the test. Similarly, Dr. Spiehler testified that in the relevant medical literature, twelve hours after ingestion was the longest time 6-AM was found to have remained in urine. To say that the result obtained here is unlikely, however, is not the same thing as saying that it would have been impossible.

Indeed, our review of the record indicates that Dr. White and Dr. Spiehler were decidedly tentative in their testimony regarding the time period over which 6-AM could be detected in urine. Thus, for example, Dr. White stated that 6-AM metabolites "ought to be around for a couple of hours," and "may be out" in eight to ten hours. R. at 353 (emphasis added). Asked again how long it might take for 6-AM to no longer show up in urine, he responded: "I'd say within ten hours, probably a little less, simply because it does have a very short half-life." R. at 354 (emphasis added). These remarks are estimates, not categorical pronouncements.

23

In addition, Dr. White opined that how long 6-AM may remain in a person's urine can be affected by factors such as the person's metabolism and his degree of hydration. Nothing in the record indicates that these factors could not account for the presence of 6-AM metabolites in Swaters's urine beyond the substance's typical half-life.

Dr. Spiehler's testimony was similarly tentative regarding how long after ingestion 6-AM might be detected in a person's urine. She stated, for example, "I think it would have to have been more than two hours before the urine was donated, but less than 12 hours." R. at 451 (emphasis added). She also opined that "[i]f the heroin had been ingested more than 12 hours prior to the urine collection . . . it's unlikely that [6-AM] would have been detected at all in the urine at a 10 [ng/ml] level." R. at 456-57 (emphasis added). Again, like Dr. White's testimony, these statements express generalities and probabilities, not definitive limits or medical certainties. On this record, the NTSB could reasonably reject Swaters's claim that it was impossible for him to have ingested the drugs during the evening of February 25, or at some time prior to 4:55 a.m.

Moreover, even if Swaters were correct in maintaining that he could not possibly have ingested the heroin prior to 4:55 a.m., it still would not have been arbitrary and capricious for the Board to conclude that the sample belonged to Swaters. On the contrary, the Board could reasonably have reached an even more

24

disquieting conclusion on this record: namely, that Swaters took the drug within ten to twelve hours of submitting his sample. Such a conclusion would constitute even more formidable evidence that Swaters was indeed under the influence of the prohibited substances during any or all of the February 26, 2007 flights to Orlando, to Kingston, Jamaica, and Fort Lauderdale.

Swaters claims that he could not have taken any drugs after 4:55 a.m. because after that time he was constantly in the presence of crew members. As a result, he argues, he had no opportunity to take any drugs; he also points to the fact that none of the people who interacted with him during this period observed any sign that he was under the influence of the drugs.

It is simply untrue, however, that Swaters was never alone after 4:55 a.m. on February 26. At a minimum, Swaters was alone when using the restroom during the time period in question. Swaters acknowledged that he used the restroom between the legs of the various flights on that day, and he admitted that when he used the airplane's restroom, he was unaccompanied. R. at 440-41. The exact number and duration of his bathroom breaks is unclear from the record. Swaters was also unclear as to whether he might have used restrooms other than the one on the airplane. At all events, Swaters's testimony indicates that there was a period of

roughly thirty to forty minutes between his flights that day.[8]  There is substantial evidence in the record suggesting that Swaters had the opportunity to take the drugs during this period.  To be sure, the ALJ said that "it appear[ed] indeed unlikely that the Respondent could have ingested prohibited drugs in the quantities found in his urine after he reported for work at 4:55 a.m. on February 26, 2007."  Order at *10.  Notably, however, we have neither a finding of fact nor a square holding from either the ALJ or the Board about when Swaters had taken the drugs.  What they did find categorically was that the sample containing the offending metabolites belonged to him.

As for the lack of symptoms, both Dr. White and Dr. Spiehler[9] testified that the observable effects resulting from this combination of substances could be

---

[8] Swaters referred to the stops between his flights on February 26 as "quick turn[s]," as opposed to lengthy stops.  R. at 417.  The first flight arrived at Orlando from San Juan at 8:06 a.m. and embarked on the second flight leg to Fort Lauderdale at 8:42 a.m.  R. at 417.  Swaters's testimony is unclear as to the length of time between the plane's arrival at Fort Lauderdale and its departure for the next flight to Kingston, Jamaica.  However, there was a period of thirty-three minutes on the ground between arriving from Fort Lauderdale and departing for Kingston, Jamaica.  R. at 419.

[9] We note that it is unclear whether Dr. Spiehler was qualified to opine on questions of symptomology.  At the hearing before the ALJ, there was some confusion as to what Dr. Spiehler was being offered as an expert for.  At first, she was offered as an expert "for the purposes of offering an opinion as to the symptomology of the drugs that [Swaters] is alleged to have ingested here."  R. at 449.  However, on questioning from the ALJ, Swaters's counsel stated that he was offering Dr. Spiehler "as an expert in the pharmacology of the drugs that [Swaters] is alleged to have ingested."  R. at 450.  It was under the latter description that Dr. Spiehler was accepted.  Dr. Spiehler's testimony regarding symptoms is of limited value in any event, given her admission that she "couldn't really extrapolate behavior or symptoms from urine levels."  R. at 451.

affected by a variety of factors.  For example, when asked whether an observer would notice anything unusual in the behavior of a person who had taken the drugs found in Swaters's sample, Dr. White replied that it would "depend[] on who's doing the observing, whether you've got a trained observer or not."  R. at 355. Additionally, Dr. White opined that the symptoms exhibited would "depend[] on how much they took."  R. at 355.  Dr. Spiehler, too, stated that the size of the dose, as well as the user's tolerance to the drug, could affect the symptoms exhibited by a user, and conceded that she "couldn't really extrapolate behavior or symptoms from urine levels."  R. at 451.  Hence, the fact that no one observed anything unusual in Swaters's behavior does not compel the conclusion that he could not have taken the drugs after 4:55 a.m.  In short, there was nothing arbitrary and capricious about the Board's conclusion that Swaters's "uncredited testimony and the testimony of his witnesses as to their observations regarding the absence of any visible signs of drug intoxication . . . [were] insufficient to carry his burden to rebut the prima facie case."  Order at *5.

We, therefore, hold that it was not arbitrary and capricious for the Board to conclude that the FAA had made a prima facie showing that Swaters's urine sample had tested positive for prohibited substances.  Likewise, it was not arbitrary and capricious for the Board to conclude that Swaters failed to rebut the FAA's prima facie case.  The most that can be said in petitioner's favor is that he

27

succeeded in raising the possibility that the sample may not have been his.  As we have noted, however, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  McHenry, 668 F.2d at 1190 (quotation marks omitted).  Even if the Board could have accepted Swaters's position, it did not act arbitrarily and capriciously in declining to do so.  Because we cannot say that the Board's decision was an arbitrary or capricious one, we affirm its decision upholding the revocation of Swaters's certificates and we deny his petition for review.

**AFFIRMED, PETITION DENIED.**