# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued January 22, 2016                    Decided June 24, 2016

No. 14-1277

JEFFREY SWATERS,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
RESPONDENT

---

On Petition for Review of an Order of the
United States Department of Transportation

---

*Tony B. Jobe* argued the cause and filed the briefs for petitioner.

*Lowell V. Sturgill Jr.*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Benjamin C. Mizer*, Assistant Attorney General, *Vincent H. Cohen*, *Jr.*, Acting U.S. Attorney, *Leonard Schaitman*, Attorney, *Paul M. Geier*, Assistant General Counsel for Litigation, United States Department of Transportation, and *Paula Lee*, Trial Attorney.

Before: GARLAND,[*] *Chief Judge*, ROGERS, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Jeffrey Swaters, a former pilot with Spirit Airlines, challenges the Department of Transportation's refusal to consent to the release of the urine sample it says Swaters produced for a mandatory drug test. The sample, which tested positive for controlled substances, cost Swaters his job and his airman medical certificate. *See Swaters v. Osmus*, 568 F.3d 1315 (11th Cir. 2009); *Sturgell v. Swaters*, NTSB Order No. EA-5400, 2008 WL 3272390 (2008). Swaters now wants the urine sample in order to conduct a DNA test in the hope of proving, in a state court negligence action, the urine is not his. We hold that neither the DoT's general rule against releasing urine samples for DNA testing, nor its refusal to release the sample in this case, is arbitrary, capricious, or contrary to the Omnibus Transportation Employee Testing Act of 1991. We also hold that Swaters's constitutional challenges to the rule fail.[1] We therefore deny Swaters's petition for review.

---

[*] Chief Judge Garland was a member of the panel at the time the case was argued but did not participate in this opinion.

[1] Since the merits of this case are straightforward and preclusion "is not a jurisdictional matter," *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005), we do not address the DoT's argument that Swaters's suit is barred by res judicata or collateral estoppel.

## I. Background

After captaining a flight to Ft. Lauderdale one day in 2007, Swaters was informed he had been randomly selected for a drug test. *Swaters*, 568 F.3d at 1316-17. Such tests are required by law. The Omnibus Act, Pub. L. No. 102-132, 105 Stat. 952, requires the Federal Aviation Administration to establish drug-testing programs for "employees responsible for safety-sensitive functions," including commercial pilots. *See* 49 U.S.C. § 45102(a). The FAA's testing regime is governed by 49 C.F.R. Part 40. As required by the Omnibus Act, the provisions of Part 40 for testing pilots accord with the testing guidelines of the Department of Health and Human Services. *See* 49 U.S.C. § 45104(2).

Part 40 contains detailed instructions for the collection and handling of urine samples. *See* 49 C.F.R. §§ 40.41-73. Among other things, collectors must maintain personal control over a specimen throughout the collection process and ensure that no one other than the employee being tested touches the sample until it has been sealed. *Id.* § 40.43(d). After the sample is divided in two and each moiety is bottled and sealed (to allow for confirmatory testing), the collector must write the date on tamper-evident bottle seals and the employee must add his initials to certify that the bottles contain the sample he provided. *Id.* § 40.71(b). Both the employee and the collector must also sign a Federal Custody and Control Form (CCF). *Id.* § 40.73(a). The collector then places the specimen bottles and a copy of the CCF in a secured plastic bag in the employee's presence, puts the bag in a shipping container, seals the container, and sends the sample to a testing laboratory without delay. *Id.* § 40.73(a)-(c).

4

There is every indication these procedures were followed when Swaters gave his sample at the collection facility. *See Swaters*, 568 F.3d at 1322-23. Swaters signed the CCF, declaring:

> I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

*Id.* at 1317. He also initialed the sealed specimen bottles. *Id.*

Swaters's specimen was sent to Quest Diagnostics, Inc., an HHS-approved testing laboratory. *Id.* Two weeks later, Quest reported to Spirit Airlines that Swaters's sample contained morphine at more than eight times the legal limit, a metabolite of heroin at more than 49 times the legal limit, and a metabolite of cocaine at more than 63 times the legal limit. *Id.* at 1317 n.2.

Swaters denied using the drugs and requested that his split sample be tested at a different lab. *Id.* at 1317. That was done by Diagnostic Sciences, Inc., another HHS-approved facility, which reported the same results as had Quest. *Id.* at 1317-18. On the basis of these positive tests, the FAA found Swaters had violated 14 C.F.R. §§ 91.17(a)(3) & 121.455(b), which prohibit intoxication by pilots, and issued an emergency order revoking his Airline Transport Pilot and First Class Airman Medical certifications. *Id.* at 1318.

Swaters appealed the revocation of his certificate to the National Transportation Safety Board. An Administrative

Law Judge conducted a two-day evidentiary hearing at which both Swaters and the FAA put on multiple witnesses. *See Swaters*, 2008 WL 3272390 at *1. While Swaters offered several affirmative defenses – notably that he did not use any drugs and that his samples were mishandled – the ALJ found his testimony not credible and concluded there was "no reason to doubt" the validity of the positive tests. *Id.* at *7-8. The full Board affirmed, holding the testimony of Swaters and his witnesses was "insufficient to carry [Swaters's] burden to rebut the prima facie case" presented by the FAA. *Id.* at 5. On further review, the Eleventh Circuit Court of Appeals upheld the Board's decision, holding "it was not arbitrary and capricious for the Board to conclude that the FAA had made a prima facie showing," and "that Swaters failed to rebut the FAA's prima facie case." *Swaters*, 568 F.3d at 1327.

Some months after the Eleventh Circuit upheld the revocation of his license, Swaters filed a lawsuit for negligence in Florida state court against Concentra, the company that had collected his urine sample. In that action, Swaters served subpoenas on Quest Diagnostics, Inc. and its subsidiary, Quest Diagnostics Clinical Laboratories, Inc. (collectively "Quest"), seeking to obtain his original urine sample. *See Quest Diagnostics, Inc. v. Swaters*, 94 So. 3d 635, 636-37 (Fla. Dist. Ct. App. 2012). Quest objected to the subpoena, arguing DoT regulations prohibited it from releasing any samples without the Department's consent, which the DoT was not willing to give. *Id.* at 637. The trial court granted Swaters's motion to compel production, but the court of appeals quashed the order, finding that federal law prevented discovery without the DoT's consent. *Id.* at 638. The Florida Supreme Court declined to review the decision.

In 2014, Swaters's attorney sent to Patrice Kelly, the Acting Director of the Office of Drug & Alcohol Policy &

6

Compliance (ODAPC), a formal request that the DoT consent to Quest releasing Swaters's sample "pursuant to 49 C.F.R. § 40.331(f)." He sent a similar message to Anne Bechdolt, an attorney in the DoT Office of the General Counsel. Because the purpose of the request was to conduct DNA testing on the sample, Bechdolt explained, there was little she could do in light of the DoT's "long-standing position," codified in 49 C.F.R. § 40.13, against "allow[ing] DNA testing on DoT specimens." Citing the preamble to the Department's testing regulations, *Procedures for Transportation Workplace Drug and Alcohol Testing Programs*, 65 Fed. Reg. 79,462, 79,484 (Dec. 19, 2000), she explained: (1) the DoT believed a properly documented chain of custody was sufficient to establish the identity of a specimen; and (2) the DoT was concerned that a negative DNA match could not account for the possibility that the subject attempted to defeat the test by substituting either the original or control sample.

After several more exchanges with Bechdolt, Swaters's attorney wrote to the Acting Deputy Secretary of Transportation, Victor Mendez, and to the DoT General Counsel, Kathryn Thomson, about his request. Bechdolt and Thomson then spoke with Swaters's attorney by phone, reiterating that § 40.13 prohibits releasing samples for DNA testing and again explaining why. The attorney followed up by mailing Bechdolt and Kelly a lengthy questionnaire, at which point Thomson sent him a final decision stating "no further explanation is warranted" because the "regulations set forth in 49 CFR part 40 are clear." Swaters then petitioned this court for review.

## II. Analysis

Swaters challenges the DoT's decision on three grounds. First, he argues the DoT's refusal to release his sample was

arbitrary and capricious, both because the Department never explained its reasoning, and because it improperly interpreted its own regulations. Second, he argues that insofar as the DoT's regulations do prohibit the release of a sample for DNA testing, they are themselves arbitrary and capricious, and inconsistent with the Omnibus Act. Finally, he maintains that his inability to obtain his sample violates his constitutional rights. None of these arguments is persuasive.

## A. The DoT Reasonably Refused to Release Swaters's Sample

Swaters argues the DoT's refusal to release his sample was arbitrary and capricious because the Department "failed to provide any rationale for its decision." He is, of course, correct that an agency must offer "an explanation that will enable the court to evaluate the agency's rationale at the time of decision," *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 414 (D.C. Cir. 2011) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)); he is incorrect, however, in claiming the DoT failed to provide an adequate explanation for its decision in this case. As the Department correctly points out, DoT officials repeatedly explained the agency's longstanding prohibition against the release of samples for DNA testing, and cited and extensively quoted the relevant regulations to document their position. These numerous written communications – as well as oral communications memorialized contemporaneously in writing and included in the record – made plain the DoT's rationale for the decision. *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738 (D.C. Cir. 2001).

Swaters also argues the Department incorrectly interpreted § 40.13 to block the release of samples for DNA testing. The Department, unsurprisingly, disagrees, as do we.

The meaning of § 40.13(c) is clear on its face: "a laboratory is prohibited from making a DOT urine specimen available for a DNA test or other types of specimen identity testing." None of the other Part 40 provisions cited by Swaters says anything to contradict this unambiguous prohibition. Section 40.331(f), which states that a laboratory "must not release or provide a specimen or a part of a specimen to a requesting party, without first obtaining written consent from ODAPC," implies only that DoT might, under unspecified circumstances, consent to a sample release. *Id.* § 40.331(f). Section 40.99 requires laboratories to retain specimens upon request and lists, as a possible purpose for such a request, "preserving evidence for litigation," but it, too, is silent about the conditions for releasing a specimen. *Id.* § 40.99(c). Finally, §§ 40.27 and 40.355 prohibit employers and testing facilities from requiring an employee to sign a release of liability for negligence in the drug testing process, but § 40.13 does not release testing facilities from liability; it merely limits what type of evidence a plaintiff is able to use to prove his case.

## B. The Rule Does Not Violate the APA

Swaters next argues that if § 40.13 indeed bars the release of his urine sample for DNA testing, then it is unlawful. Since Swaters cannot show the regulation is irrational or inconsistent with the Omnibus Act, however, this court will not set it aside. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 464 U.S. 29, 42 (1983).

### i. The Rule is Not Arbitrary or Capricious

To be "rational," a regulation must be "the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). The DoT's testing policy easily clears

this rather low bar. In the preamble to its testing regulations, the Department explained that it opposes DNA testing for "two main reasons." 65 Fed. Reg. at 79,484. First, "a properly completed chain of custody conclusively establishes the identity of a specimen. No additional tests are required for this purpose." *Id.* Second, "the only thing a DNA test can do is determine . . . whether a specimen and a reference specimen were produced by the same individual." *Id.* That is, even if a DNA test were conclusively to prove the positive sample does not belong to Swaters, the DoT could not determine whether the mismatch was due to an error in handling or to the tested employee's substitution of someone else's urine in the original sample, the reference sample, or both. Because a properly preserved chain of custody renders the first possibility very unlikely, and the second possibility would arise only if a guilty employee was trying to defeat the test, the DoT quite reasonably – in view of the risk to airline safety – wants to avoid reinstating a pilot's license on the basis of a DNA mismatch.

Swaters argues the Department's reliance upon chain-of-custody evidence "ignore[s] the fact that it is widely accepted in the industry as well as within the agency itself that the collection process is the 'weak link' in the testing program." Swaters's source for this assertion is a report by the Government Accountability Office stating that "DoT's drug testing program is vulnerable to manipulation by drug users," which can give rise to false negative results. GAO-08-225T, Drug Testing: Undercover Tests Reveal Significant Vulnerabilities in DOT's Drug Testing Program (2007). As the DoT points out, the report says nothing about DoT testing producing false positive results.

Swaters also argues the agency's concern about substitution is illogical because no employee would

purposefully substitute a tainted sample for his own during a drug test. As the Department notes, however, one might substitute a tainted sample unwittingly, believing the source was clean. Finally, Swaters contends that even if the DoT's rationale was reasonable when first offered in 2000, the Department's continued reliance upon it today is irrational in light of the intervening advances in DNA testing. This argument mistakes the reason for the DoT's policy: The preamble to the regulations does not express concern that DNA testing is inaccurate; rather, the Department is concerned that a mismatch could not rule out manipulation by substitution.

All of this is not to say that a pilot in Swaters's position has no recourse if his urine sample tests positive for narcotics. Pilots have ample procedural protections, including an opportunity to challenge the test result in an administrative hearing before an Administrative Law Judge with subpoena power. 49 C.F.R. §§ 821.35, 821.37-40. At that hearing, which follows the Federal Rules of Civil Procedure and Evidence "to the extent practicable," *id.* §§ 821.5, 821.38, the pilot has the right to present evidence, to depose witnesses, and to testify, among other procedural rights. *See, e.g.*, *id.* §§ 821.6, 821.19-20, 821.39. The pilot also has the right to an administrative appeal, *id.* § 821.47(a), and the right to petition for judicial review, *id.* § 821.64(a). The DoT's rule in this case does not abrogate those procedural protections; it simply reflects the determination that a particular type of evidence is more likely to undermine the test results of a guilty subject than to vindicate an innocent one, and therefore should not be used. Because the DoT's concern about cheating on a drug test is reasonable, the court will not set aside the agency's rule against releasing urine samples. *See Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 927 (D.C. Cir. 2013).

### ii. The Rule Does Not Violate the Omnibus Act

Contrary to Swaters's contention, Part 40 is not inconsistent with the Omnibus Act; indeed, it appears to be required by it. The statute provides that "the Administrator of the Federal Aviation Administration shall develop requirements that . . . incorporate the Department of Health and Human Services scientific and technical guidelines." 49 U.S.C. § 45104. Those HHS Guidelines state that specimens "must only be tested for drugs and to determine their validity," and that "[u]se of specimens by donors, their designees, or any other entity, for other purposes (e.g., deoxyribonucleic acid, DNA, testing) is prohibited unless authorized in accordance with applicable federal law." 80 Fed. Reg. at 28,122. The DoT argues, and Swaters makes no attempt to refute, that the Department could not have implemented a different rule in light of 49 U.S.C. § 45104 and the HHS Guidelines.

### C. The Constitutional Challenges Fail

Swaters's constitutional arguments also lack merit.[2] Swaters contends the DoT's refusal to consent to release of his urine sample for DNA testing effectively blocks his access to Florida state court. Citing *Bounds v. Smith,* 430 U.S. 817, 821 (1977), Swaters argues that access to the courts is a fundamental due process right and any government regulation that burdens that right must therefore stand up to strict scrutiny.

---

[2] Swaters's argument that the DoT's regulations violate the Tenth Amendment by preempting state law is insufficiently developed to warrant consideration. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001).

*Bounds* has no bearing upon this case; it concerned prisoners who lacked access to a library or any other resources to conduct legal research or draft complaints. 430 U.S. at 817-818. Swaters is not a prisoner who has been denied access to the courts; he is a civil litigant who has been denied discovery of a piece of evidence he believes is favorable to him. He offers no legal support for his position that the Constitution entitles him to such discovery. Indeed, in *District Attorney's Office for the Third Judicial District v. Osborne*, the Supreme Court denied a prisoner's petition "to obtain postconviction access to the State's evidence for DNA testing," 557 U.S. 52, 52 (2009), explaining that there is no "freestanding right to DNA evidence untethered from the liberty interests [a litigant] hopes to vindicate with it," *id.* at 72. If postconviction incarceration is an insufficient deprivation of liberty to create a right to DNA testing, then *a fortiori* Swaters's liberty interest in being free of a government-imposed "stigma on [his] professional reputation," *Owen v. City of Independence, Mo.*, 445 U.S. 662, 662 (1980), is likewise insufficient.

Swaters also contends that § 40.13 is unconstitutionally vague because it does not specify to whom a laboratory is prohibited from furnishing a DoT urine sample for DNA testing. But in the absence of any limiting terms, the plain – and certainly not vague – meaning of the regulation prohibits release of the urine sample to anybody. 49 C.F.R. § 40.13(c) ("[A] laboratory is prohibited from making a DOT urine specimen available for a DNA test or other types of specimen identity testing").

### III. Conclusion

For the foregoing reasons, we conclude the DoT's denial of Swaters's request for his urine sample was sufficiently

explained, reasonable, and consistent with the Omnibus Act. We also reject Swaters's constitutional challenges. Accordingly, the petition for review is

*Denied.*